FILED

# UNITED STATES DISTRICT COURT

## FOR THE EASTERN DISTRICT OF VIRGINIA

### ALEXANDRIA DIVISION

2014 JUN 27 P 3: 24

CLERK US DISTRICT COURT
ALEXANDRIA, VIRGINIA

| | | |
|---|---|---|
| "JIM MARKSON" | ) | |
|     Plaintiff, | ) | |
| | ) | |
| v. | ) | |
| | ) | |
| CENTRAL INTELLIGENCE AGENCY | ) | |
| McLean, Virginia | ) | 1:14-CV-814 |
|     and | ) | (LO/IDD) |
| | ) | |
| JOHN D.B. | ) | |
| MARK K. | ) | |
| PAUL S. | ) | |
| CARL G. | ) | |
| JOHN R.B. | ) | |
| LARRY N. | ) | |
| COLIN S. | ) | |
| MARK P. | ) | |
| CARMEN M. | ) | |
| DAVID BUCKLEY | ) | |
| VALERIE C. | ) | |
| RICHARD P. | ) | |
| KAREN P. | ) | |
| DONALD R. | ) | |
|     And | ) | |

1

JOHNs DOE                                         )

c/o the Central Intelligence Agency               )

McLean, Virginia                                  )

      Defendants                               )


## COMPLAINT (FILED UNDER SEAL)


Plaintiff Jim Markson (a CIA-issued alias) brings this action against Defendants Central

Intelligence Agency, John D. B, Mark K., Paul S., Carl G., John R. B., Larry N. , Colin S., Mark

P., Carmen M., David Buckley, Valerie C., Richard P., Karen P., Donald R., and John(s) Doe,

jointly and severally, pursuant to the First, Fourth, and Fifth Amendments to the United States

Constitution, the Privacy Act, 5 U.S.C. 552(a) *et seq*., the Federal Declaratory Judgment Act, 28

U.S.C. 2201, the All Writs Act, 28 U.S.C. 1651, and the Central Intelligence Agency's internal

regulations and procedures, including 29 C.F.R. § 1614.407.


## JURISDICTION

1.     The Court has jurisdiction over this action pursuant to 5 U.S.C. §§ 552a(g)(1),

702 and 28 U.S.C. §§ 1331, 1346(b), 2675.


## VENUE

2.     Venue is appropriate in the Eastern District of Virginia under 5 U.S.C. §§

552a(g)(5), 703 and 28 U.S.C. § 1391.

2

## PARTIES

3.     Plaintiff Jim Markson (CIA-assigned alias) has been a staff employee of the Central Intelligence Agency (CIA) for the past 29 years.  For the past 15 years he has served within the CIA's National Clandestine Service (NCS), formerly known as the Directorate of Operations.  Markson's true name and employment status are known to the defendants

4.     Defendant Central Intelligence Agency (CIA) is an agency as defined by 5 U.S.C. § 552a(a)(1), 701.

5.     Defendant John D.B. was Director of the Agency's National Clandestine Service (D/NCS) during some of the events described in this complaint.  He was the direct supervisor of Mark K., further identified below.  John D.B. was advised of multiple violations of Agency regulations and the U.S. Constitution and endorsed these actions as appropriate.  John D.B. specifically excluded Markson from future employment within an entire class of NCS positions as a result of Markson's having drafted a fictional manuscript.

6.     Defendant Mark K. is a Senior Executive of the CIA and concurrently held positions as Deputy Director of the NCS (DD/NCS), and Chief of the Counterintelligence Center (C/CIC), during the events discussed in this complaint.  Mark K. unilaterally established a rule prohibiting subordinates from drafting manuscripts, even fictional manuscripts, which involved activities similar to their genuine government duties.  Mark K. cancelled Markson's onward assignment for violating the above unwritten rule and communicated with others in an effort to prevent Markson's manuscript from being published.  (Mark K. is identified as "Juan R." within multiple internal CIA email communications attached hereto as exhibits 1-35.)

7.     Defendant Paul S. is a Senior Executive within the NCS and worked as the Deputy Chief of the Counterintelligence Center (DC/CIC) during the events discussed in this

complaint.  Defendant Paul S. communicated and coordinated with defendant Mark K. to enact

and enforce a rule prohibiting subordinates from drafting any manuscript that involved activities

similar to their genuine government duties.  Defendant Paul S. advised Markson of the decision

to cancel the latter's onward assignment as a disciplinary action for violating the above

unwritten.  (Paul S. is identified as "Robert C." within multiple internal CIA email

communications hereto attached as exhibits 1-35.)

8.      Defendant Carl G. is a Senior Executive within the NCS and worked as Deputy

Chief of the Division that handles domestic operations during the events discussed in this

manuscript.  Carl G. reviewed Markson's draft manuscript and was aware of the improper

punitive actions taken against Markson as a result.  Carl G. subsequently declared Markson

unqualified for positions to which Markson was qualified.  (Carl G. is identified as "Tony N."

within multiple internal CIA email communications hereto attached as exhibits 1-35.)

9.      Defendant John R.B is a senior manager within the NCS and worked as Chief of

Operations in the Division that handles domestic operations during the events discussed in this

manuscript.  John R.B. had direct knowledge of the unlawful actions taken against plaintiff, and

authored official traffic inquiring about said events.  John R.B. propagated untrue rumors that

Markson was involved in an "altercation" at CIA Headquarters and was escorted out of

Headquarters by security officers.  Upon receipt of declaration from Markson clarifying that he

had acted in accordance with Agency regulations, had not been involved in any altercation at

HQS, and had not been escorted from HQS by security officers, John R.B. took no action to

remedy the rumors or correct the actions taken against Markson.  (John R.B. is identified as

"Denver L." within multiple internal CIA email communications hereto attached as exhibits 1-

35.)

10.     Defendant Larry N. was a Senior Executive within the NCS at the time of events discussed in this complaint.  More specifically Larry N. served as Chief of a domestic facility, where he was Markson's second-level supervisor.  In the above capacity Larry N. had routine access to private emails between Markson and various offices of potential redress at CIA headquarters.  After Markson submitted a draft fictional manuscript for review to the Publication Review Board (PRB), in full compliance with all CIA rules and regulations, Larry N. made derogatory comments regarding Markson's judgment and performance.  Larry N. reviewed Markson's draft manuscript and alerted defendant Mark K. to the existence of this manuscript, suggesting that the drafting of this manuscript was a demonstration of poor judgment.  Larry N. also shared Markson's manuscript with defendant Colin S., and subsequently suggested that Markson had improperly used the services of an editor/ghost writer without obtaining proper approvals.  (Larry N. is identified as "Stephen S." within multiple internal CIA email communications hereto attached as exhibits 1-35.)

11.     Defendant Colin S. is a senior manager with the NCS and served as chief of personnel management for the division that handles domestic operations during some of the events described in this complaint.  Upon improper receipt of Markson's manuscript from Larry N., Colin S. suggested that Markson had employed the services of an editor/ghost writer without obtaining appropriate approvals.  Colin S. was involved in two personnel panels wherein Markson was not selected for positions for which he was qualified.  Colin S. has stated that events associated with Markson's submission of a fictional manuscript, and associated punitive actions, are well known within the NCS.   (Colin S. is identified as "Floyd B." within multiple internal CIA email communications hereto attached as exhibits 1-35.)

12.     Defendant Mark P. is a senior manager with the NCS and served in the Counterterrorism Center (CTC) during events discussed in this complaint.  In response to Markson's application for a CTC position, Mark P. took actions to acquire information regarding Markson's drafting of a manuscript, and associated punitive actions, the details of which constitute an informal "hall file" on Markson.  Mark P. used this information to deny Markson a position for which Markson was qualified.

13.     Defendant Carmen M. is a Senior Executive with the CIA and served as Director of the Agency's Center for Mission Diversity and Inclusion (D/CMDI) during the time of events described in this complaint.  In the above capacity Carmen M. was directly briefed on illegal activities of other Agency Executives and managers, specifically the unlawful and unconstitutional actions taken against Markson.  When Markson filed a grievance with the CMDI, seeking protection from above actions, Carmen M. declared that his complaint did not constitute a grievance within the charter of the CMDI.

14.     Defendant Valerie C. is an Investigator with the CIA's Inspector General (IG).  In this capacity she was responsible for actions taken in response to a report by Markson to the IG alleging ongoing violations of Agency regulations, federal law, and the U.S. Constitution. Valerie C. declined to take any action regarding Markson's report and asserted that said actions were legal and in accordance with Agency policy.

15.     Defendant David Buckley has served as the Inspector General (IG) of the CIA since 2010.  In this capacity he is responsible for the investigation of illegal actions by Agency employees.  Upon being advised of such illegal and unconstitutional actions taken against Markson, Mr. Buckley declined to take any action and asserted that said actions were legal and in accordance with Agency policy.

6

16.     Defendant Richard P. is Chairman of the CIA's Publication Review Board (PRB). In the above capacity Richard P. has repeatedly denied Markson permission to publish a fictional manuscript.  He has prolonged a manuscript review process from a standard of 30 days to over 2 years.  Richard P. has improperly claimed the authority to treat fictional manuscripts the same non-fiction real life events.  He has improperly identified known fictional events, activities, and facilities as "classified".   He has repeatedly refused to comply with Agency regulations regarding the review of Markson's manuscript.

17.     Defendant Karen P. was the NCS representative to the PRB at the time of initial events described in this complaint.  In the above capacity Karen P. has repeatedly denied Markson permission to publish a fictional manuscript.  She has prolonged a manuscript review process from a standard of 30 days to over 2 years.  Karen P. has improperly claimed the authority to treat fictional manuscripts the same non-fiction real life events.   She has declared, without substantiation, that Markson's manuscript was autobiographical.  She has improperly identified known fictional events, activities, and facilities as "classified".   Karen P. has repeatedly refused to comply with Agency regulations regarding the review of Markson's manuscript.

18.     Defendant Donald R. was the NCS representative to the PRB at the time of latter events described in this complaint.  In the above capacity Donald R. has denied Markson permission to publish a fictional manuscript.  He has prolonged a manuscript review process from a standard of 30 days to over 2 years.  Donald R. has improperly claimed the authority to treat fictional manuscripts the same non-fiction real life events.  He has improperly identified known fictional events, activities, and facilities as "classified".   Donald R. has repeatedly refused to comply with Agency regulations regarding the review of CIA employee materials.

19.     Defendants John Doe are officers within the CIA with access to the activities of the PRB.  These defendants knowingly distributed and/or received private and protected information regarding Markson's draft fictional manuscript without any authority, in violation of the CIA's "need to know" principle and specific regulations.


## PRELIMINARY STATEMENT

In 2007 the Chairman of CIA's Publication Review Board (PRB), John Hollister Hedley, publicly stated that the sole purpose of the Central Intelligence Agency's ["the Agency"] prepublication review process was to assist Agency authors in avoiding inadvertent disclosure of classified information which, if disclosed, would be damaging to national security.[1]  Mr. Hollister further noted that Agency employees have a "right to write", and asserted that pre-publication review process was not aimed at discouraging the exercise of such rights. Id.  While rightly noting that the courts have ruled Agency employees have a lifetime obligation to submit to this review process, he also indicated that the obligation was only legitimate when the Agency limited itself to "the deletion of classified information and so long as a review of a proposed publication is conducted and a response given to its author within 30 days."  Speaking on behalf of the Agency, Mr. Hollister also stated that "When replying to an author, the PRB's response either will identify words or passages for deletion or revision on the one hand or, on the other, will provide a nihil obstat, granting permission to publish by posing no objection." Id.

The above is the way it should be.  The following describes what really happens.

---

[1] Hedley, John Hollister: "Reviewing the Work of CIA Authors; Secrets, Free Speech and Fig Leaves"; *available at* https://www.cia.gov/library/center-for-the-study-of-intelligence/kent-csi/docs/v41i3a01p.htm

Jim Markson (a CIA-issued alias) has faithfully served the country and the CIA for 29 years, working in both the Agency's Office of Security, and the National Clandestine Service ["NCS"]. He has received over a dozen Exceptional Performance awards, multiple foreign conflict medallions, and consistently favorable performance evaluations.

In 2011- 2012, Markson drafted a novel about a fictional terrorist plot to attack opening day professional football games on the approximate 10-year anniversary of 9/11. A sub-plot involves the protagonist's attempts to deal with a dysfunctional and occasionally maleficent bureaucracy, while concurrently trying to disrupt the terrorist plot. In the book CIA management is occasionally portrayed in a negative light.

Markson's immediate supervisor and coworkers were aware of the above activities. Similar books had been drafted by predecessors holding the exact same position as Markson without any issue and this was discussed between Markson and his immediate supervisor.

In May 2012, Markson submitted his draft manuscript to CIA Headquarters in accordance with Agency regulations. Shortly thereafter he was summoned to Headquarters ["HQS"] and advised that his onward assignment, a coveted position for which he had been competitively selected, had been cancelled as a result of having drafted the manuscript. When he attempted to appeal this decision within his chain of command, he was advised that he would also be considered ineligible for an entire class of sensitive positions within the NCS.

For the first time in his career, Markson's performance evaluation included disparaging comments as a result of having drafted his manuscript. False rumors were spread that Markson was involved in an "altercation" while attempting to appeal the above personnel actions and had been escorted out of HQS by security. As evidenced in the below statement of facts, all of the

above actions were predicated upon the singular fact that Markson had submitted a draft manuscript to his HQS, an action allowed by regulation but consistently described by defendants as an egregious act of such poor judgment it warranted punishment. At the time the above actions were taken there had been no finding as to whether the manuscript contained any classified information and/or was suitable for publication.

In response to Markson's submitted draft manuscript, the Agency's Publication Review Board (PRB) tasked his immediate supervisor to review the book for possible inclusion of classified information. Markson's supervisor responded in writing that there was nothing classified in the manuscript and confirmed it was a work of fiction.

Despite the above, in August 2012 the PRB denied Markson permission to pursue publishing, citing six alleged instances of classified information contained in the book, as well as material it deemed inappropriate for publishing by a current staff employee. In the background, as the exhibits will show, were emails being circulated within the NCS division speculating that the work was "autobiographical" because some of the relationship between the main character and a supervisor was tense and contentious. Markson was not aware of this speculation. He asked the PRB to reconsider their finding, providing evidence that the "classified" citations were included as "unclassified" in published prior works of fiction and non-fiction. He re-wrote two of the citations to appease the PRB.

In October 2012 the PRB advised they had not been swayed by Markson's argument and now found the book to be classified in its entirety. Without specifying what material was alleged to be classified, the PRB asserted that the manuscript had not been "re-written enough". In so asserting, the PRB failed to follow Agency regulations requiring it specify what was classified, and under what theory it was deemed classified.

Markson filed a second request for reconsideration, asking the PRB to conform to governing regulations and specify what material they claimed was classified so that he could fairly rebut the findings. Over a year later, on 15 January 2014, the PRB once again denied Markson permission to pursue publication. This time they identified approximately 4% of the text alleged to be classified or inappropriate. Included among the text deemed classified were, for example, terms such as "conch fritters", "mangrove swamp", "tropical breeze", anything describing the location of the fictional events, the publicized Securities and Exchange Commission form 10-k, and assorted establishments and facilities that were known to never have existed.

During a March 2014 personal meeting, Markson asked the PRB what specific classification authority they were exercising in asserting that such fictional locations and events were classified. The Board members were unable to provide an answer. For each citation he also asked the Board how it envisioned the potential publication could cause harm to the nation's security. Once again, they were not able to provide an explanation. Markson submitted a formal request for reconsideration seeking a summary reversal of the findings. There has been no answer from the CIA as of the date of this complaint. The process that, by regulation, is supposed to be completed in 30 days, has been drawn out for over two years.

In the meantime an informal, unwritten "hall file" consisting of malicious rumors, such as an alleged "altercation" between Markson and armed security at HQS, was cultivated and circulated within the Agency in regards to Markson.[2] This "hall file" is explained further, within. In violation of Markson's privacy, half-truths and lies were spread about the content of

---

[2] The "altercation on the 7th floor" never occurred and is a completely fabricated and rampant rumor.

his manuscript, and it was made known to all interested parties that he had been deemed unsuitable for sensitive assignments.

In 2014 Markson applied for three positions, all for which he was eminently qualified. In an interview for one of the positions his prospective managers directly broached the issue of his manuscript, the alleged "altercation" at HQS, and alleged poor judgment in drafting the manuscript. In another instance he was deemed unqualified for a management position even though the vacancy notice didn't specify any minimum requirements. In a third he was deemed unqualified for an assignment whose duties he had already performed flawlessly for more than 7 years. Despite strict privacy warnings attached to Markson's manuscript as part of the review process, the attached exhibits reveal that a great number of unauthorized individuals were provided an illicit copy of Markson's manuscript.

Throughout all of the above, while staying within the strict boundaries of Agency regulations, Markson patiently pursued every opportunity at reconciliation and redress. After unsuccessfully appealing to his chain-of-command, he filed a grievance with the Agency's Center for Mission Diversity and Inclusion (CMDI). Despite his specific recitation of multiple violations of Agency regulation, U.S. law, and the U.S Constitution, the CMDI refused to entertain/adjudicate his complaint, ruling that it did not constitute a "grievance". Under Agency regulation this finding was final and not subject to further appeal.

While not a normal forum for such grievances, Markson also filed a complaint with the Agency's Inspector General. Nine months later the IG similarly advised they did not intend to investigate the matter.

The only appropriate action for the agency to have taken in the face of an inappropriate or flawed manuscript was to deny permission to publish. To determine that Markson was unfit for

duty is not only counter-intuitive but constitutionally impermissible. The undisputed fact that Markson submitted the draft to the PRB and followed all of the rules only further confirms that he is an exemplary employee. The Agency's actions amount to punishment not only of speech, but of thought. The result is no different than if Markson had kept a diary in his home, where he recorded his most personal thoughts, and this diary was discovered by his superiors. The individuals who fired him from his coveted foreign assignment were punishing him not for publishing a book, nor for even submitting the draft manuscript to the PRB, but for the **mere fact that he wrote the book.**

Jim Markson has honored his oath to protect and defend the U.S. Constitution. He has abided by the laws of his country and adhered to the regulations of his employer. In response to his attempt to exercise his constitutional rights, to merely explore the potential of fictional authorship after 29 years of service, all within the bounds of governing regulations, the Agency has:

- Taken away an assignment for which he was fairly and competitively chosen

- Excluded him from an entire class of sensitive positions

- Sullied his reputation and degraded his service to the country

- Denied him specific positions for which he was qualified

- Subverted regulations to prevent his exercise of free speech

- Denied him any opportunity for a fair hearing

- Abdicated their responsibility to govern with fairness and equity

- Abandoned their duty to protect and defend the Constitution

13

- And diminished the health and well-being of Markson and his family

## FACTS

20.     Plaintiff, Jim Markson, is a staff employee of the Central Intelligence Agency. Certain aspects of his employment, and certain specific duties associated with said employment, are classified. None of these classified or sensitive areas are at issue herein. Markson has served in the above capacity for over 25 years, including overseas assignments in difficult and dangerous situations. He has compiled an outstanding record of service including multiple service medallions and over a dozen exceptional performance awards.

21.     In 2011, Markson started drafting a fictional novel. The entire plot of the draft manuscript is set in 2011. It concludes with the arrest of fictional terrorists who were conspiring to conduct massive biological attacks against opening day professional football games in close proximity to the ten-year anniversary of the real terrorist attacks of September 11, 2001. The plot involves the efforts of a fictional CIA intelligence officer who works with a fictional former asset, without the knowledge of the CIA, trying to prevent the above attacks. A secondary theme of the above draft manuscript involves the fictional intelligence officer's struggle with dysfunctional supervisors and managers that the agency employed/ tolerated.

22.     The draft manuscript paints a fictional portrait of the CIA and the Intelligence Community, spinning yarns of bureaucratic intrigue, abuse, and frustration. Despite this very credible bureaucratic employment setting, all material aspects of the plot were drawn strictly from Markson's imagination. In fact, Markson took significant and substantive efforts to

prevent the release of any information regarding genuine operations, including providing deliberately misleading and false information to further protect genuine government methods.

23.    While drafting the manuscript in 2011 and 2012, Markson's immediate supervisor, Jeffrey E., and coworkers Dale F. and Mildred D. were aware that he was drafting a fictional novel. His often-discussed primary motivation in drafting the above manuscript was to assess his ability at fictional writing. It was his hope that he would be able to share the draft with a publishing agent for a candid assessment and perhaps pursue professional fictional writing after retirement.

24.    On or about 16 July 2011 Markson was notified via internal agency email that, after a competitive evaluation process, a personnel committee had selected him for a coveted foreign assignment to which he had previously applied. The foreign assignment was to commence in the middle of 2012. Notification of the above action was subsequently documented in official agency correspondence.

25.    In preparation for the above assignment, during the period of March – May 2012, Markson underwent a thorough and favorable routine security investigation. During the security investigation Markson disclosed that he was drafting a fictional terrorist spy thriller novel. Markson also confirmed his intent to protect any/all sensitive or classified information to which he had ever been granted access, as well as his intent to comply with all relevant agency rules and regulations. Markson's authorship activities were not further pursued as a potential security issue and his routine security investigation was favorably adjudicated.

26.    On 22 May 2012, in accordance with his employer's rules and regulations, Markson submitted a draft of the aforementioned fictional manuscript to the CIA's Publication

Review Board (PRB).  Receipt of the draft was acknowledged via internal agency email on 24

May 2012 (Exhibit 1).

## DISCIPLINARY ACTIONS AND RETALIATION

27.     As noted above, on 22 May 2012 Markson submitted his draft manuscript to the

PRB in accordance with his employer's rules and regulations.  As will be detailed later in this

complaint, the PRB's first assessment of Markson's manuscript was made on 22 August 2012.

28.     On 12 June 2012, Markson's second-level supervisor, Larry N., sent an email

(Exhibit 2, page 26) to Agency Executive Mark K. advising that he had just learned  Markson

submitted a fictional manuscript to the PRB.  Larry N. alerted Mark K.  that Markson's onward

assignment was under the auspices of the Counterintelligence Center (CIC), which is/was led by

Mark K.

29.     In the above email, Larry N. stated that he was in the process of reviewing the

manuscript and had "seen nothing to reveal the locations of (Agency) offices, officers or

operational sources and methods…"  He then opined the characters of the manuscript were thinly

veiled references to real Agency employees, including possibly himself.  Upon information and

belief, Larry N. developed a personal animus against Markson because he felt the fictional

manuscript portrayed him as a fictional character in a negative light.  Larry N. then speculated on

the potential that Markson might write a book based on his upcoming assignment, and painted

Markson's actions in drafting the manuscript as revealing a "serious lack of judgment."

30.     On 13 June 2012, Larry N. sent Mark K. another email (Exhibit 2, pages 32-33)

regarding his assessment of Markson's manuscript.  In the email Larry N. and Colin S. assessed

that the writing style of the manuscript was superior to Markson's "typical faulty writing technique" and, as a result, they suspected Markson had employed the services of an editor or ghost writer prior to submitting the manuscript to the PRB.

31.     Markson has never been confronted with above allegations but herewith denies same and avers he did not employ any editor or ghost writer in the drafting of his manuscript.

32.     On 14 June 2012, only 23 days after Markson's fictional manuscript was submitted to PRB, Mark K. directed his deputy, Paul S., to terminate Markson from his onward assignment.  The action was predicated solely on Markson's submission of a fictional manuscript to the PRB, which Mark K. asserted "bespeaks abrogation of professional responsibility, an absence of professional judgment and a besmirching of the honor of this service.  Let him grieve if he likes." (Exhibit 2, page 17)

33.     Upon information and belief, at the time Mark K. the decision to terminate was made, the only official feedback provided to the PRB regarding Markson's fictional manuscript was from Markson's supervisor Jeffrey E., who had confirmed the document was fictional, contained no classified information, and that publication would not impair the execution of duties by Markson, the CIA, or the United States Government. (Exhibits 3, 17).  However, the only informal information Mark K. is believed to have received and based the termination upon was from Larry N., (likely based on Larry N.'s unauthorized access). Even Larry N. had advised the manuscript did not "reveal the locations of (Agency) offices, officers or operational sources and methods..." (Exhibit 2, page 26).

34.     Upon information and belief, neither Mark K., nor his subordinates Paul S. or Louis K., had personally read the manuscript, nor had any authorized role or authority in reviewing the manuscript.

35.     On or about 24 June 2012, Markson's immediate supervisor, Jeffrey E., was contacted by CIA Headquarters Senior Manager John R. B. regarding the extent of Jeffrey E.'s knowledge of Markson's manuscript, and any actions he took in response to same.  Jeffrey E. responded on 25 June 2012 (Exhibit 3), advising he had been aware  Markson was drafting the manuscript, had reviewed the manuscript at the request of the PRB, had found that the manuscript contained no classified information, and was of the opinion that Markson was trying to abide by both the letter and the spirit of all relevant regulations.

36.     On 29 June 2012, only 38 days after submission of the fictional manuscript to PRB, Markson was summoned to his CIA Headquarters (Exhibit 4) and met with Agency Senior Managers Paul S. and Louis K.  Also present at the meeting was Agency Personnel Officer Brian M.  Despite the favorable comments of plaintiff's immediate supervisor, and the absence of any negative finding by the PRB, Paul S. terminated Markson from his onward foreign assignment. The termination was upon the direction and authority of the Agency Senior Executive Mark K.

37.     During the meeting, Paul S. stated he was aware Markson had drafted the manuscript at issue and advised that this fact was the sole and specific reason for terminating Markson's assignment.   Senior Manager Paul S. volunteered he had access to information regarding the PRB's activities and "had heard" the draft manuscript contained classified information, a claim Markson summarily denied, emphasizing that the manuscript was a work of fiction.  Paul S. described the mere act of having drafted and submitted the manuscript as a

display of such poor judgment as to warrant immediate termination of Markson's onward assignment (Exhibit 5).

38.     Twice during the interview, without any mention of it by Markson, Paul S. stated, of his own volition, that he did not want to discuss Markson's Constitutional rights. Specifically, he stated that the decision to terminate Markson had nothing to do with his First Amendment rights, evidencing awareness that serious constitutional concerns were possibly implicated.  The decision was presented as final and irrevocable, and Markson was not given a chance to plead his case.

39.     As noted previously, at the time of the above 29 June 2012 meeting the PRB had not taken any decision regarding the manuscript and no determination had been made as to whether the manuscript contained classified or inappropriate material.

40.     Markson has never worked for the component managed by Mark K., Paul S., and Louis K.  As such, they had no proper or legal basis to obtain/review the protected and classified manuscript.

41.     Through his comments, Paul S. implied he had obtained information regarding the manuscript, and the PRB's assessment of same, through informal and unauthorized channels, in violation of Agency regulations, and in further violation of a professional ethos restricting the dissemination of information to only those with a demonstrated "need to know."

42.     Despite the gravity of the allegations and associated consequences, the justification for cancelling Markson's onward assignment was never documented in his personnel file.  Among those Agency Executives and senior managers who had knowledge of, and supported the above action, but failed to document the basis for same, were Defendants John D.B., Larry N., Mark K., Paul S., Elizabeth K., John R.B., and Carl G.  This lack of official

documentation deprived Markson of any means to rebut the allegations and accusation, or present a defense in any sort of fair hearing.

43.     Markson herein once again reiterates that he was in compliance with all relevant Agency rules and regulations. Defendant Mark K. has subsequently stated that the fact that Markson was in compliance with applicable regulations was immaterial to his decision in the above matter. (Exhibit 2, page 45)

44.     Though the reason was not documented, the actual termination of Markson's onward assignment was documented on 29 June 2012 in official correspondence, specifically noting that the action had been taken upon the authority of Mark K. (Exhibit 6).

45.     Immediately after the above HQS meeting with Paul S. and Louis K., Markson went in person to the HQS office of John D.B., Director of the NCS, the immediate supervisor of Mark K. It was Markson's hope to keep his appeal for redress within the NCS chain-of-command. Markson met with John D.B.'s Chief of Staff and argued that the rescission of his assignment was unreasonable, inequitable, in violation of Agency regulations, and unconstitutional. The Chief of Staff listened attentively, took copious notes, and promised to be back in touch with Markson the following week. The meeting was professional and concluded in an amicable fashion.

46.     On 06 July 2012, subsequent to Markson's return to his duty location, he sent John D.B.'s Chief of Staff an email containing additional background (Exhibit 27). This email was never answered and the office of the D/NCS took no further action in response to Markson's appeal for redress.

47.     On 12 July 2012, Markson's immediate supervisor, Jeffrey E., advised Markson that Senior Manager John R. B. had stated there were rumors circulating at HQS that Markson

had been escorted from CIA Headquarters offices by armed security personnel after the meeting

with Paul S. and Louis K. where he was fired. This was referred to in his "hall file" (later

described) as the "altercation on the 7th floor." These rumors were patently false and their origin

is unknown.

48.      On the same day, at the suggestion of his immediate supervisor Jeffrey E.,

Markson sent an internal agency email (Exhibit 7) to HQS Executive John R. B. denying the

rumor and asserting the facts surrounding his retaliatory personnel action.  However, John R. B.

never responded.

49.      Throughout the above events, until this day, no one from Markson's chain of

command, or anywhere within the Agency, has ever asked him about the contents of the book,

possible correlation to real events/activities, or his intentions regarding publication.

50.      On 03 July 2012, Markson's second-level supervisor, Larry N., declared his

immediate retirement in official Agency cable traffic (Exhibit 2, page 45).  Despite the

announced retirement, on 27 July 2012 Larry N. made negative reviewing comments in

Markson's performance evaluation which directly contradicted the favorable assessment of

Markson's immediate supervisor, Jeffrey E.  Larry N. stated, without substantiation, that

Markson had displayed poor judgment and taken poor decisions that had resulted in unspecified

problems (Exhibit 8, page 7).  Larry N. has since acknowledged that these statements referred, at

least partially,  to Markson's drafting of a fictional manuscript (Exibit 8, page 8).

51.      On/about 06-09 July 2012, defendants John R.B., Paul S., Mark K., and Elizabeth

K. received an email (Exhibit 2, pages 45-48) concerning Markson's in-person appeal of his

termination to the office of John D.B., Director, National Clandestine Service.  Per the staff

officer who had met with Markson, contrary to the rumors, Markson's behavior was **reasonable**

and **professional**. In response to this description, Paul S. commented that this account was at odds with the rumor of the alleged "incident" that occurred during Markson's appeal to the D/NCS (Exhibit 2, page 47).

52.     On 04 September 2012, an email was sent to Mark K. (Exhibit 2, pages 37-44) updating him on the status of the PRB process. At the time of that email, Markson's assignment to CIC had been cancelled for 3 months and he had been advised he would be disassociated from the authority or purview of Mark K.. However, Mark K. displayed continuing interest in the non-publication of Markson's manuscript.

53.     On 28 November 2012, the Director of the National Clandestine Service (D/NCS), Defendant John D.B., endorsed Mark K.'s decision to terminate Markson's onward assignment and stated that this decision was predicated on a demonstration of "poor judgement" by Markson. Defendant John D. B. also indicated Markson  would not be considered for any future assignment to CIC positions (Exhibit 9).

54.     On 11 April 2013 Markson applied for a domestic non-management field position for which he was particularly well-qualified. At the time, Markson was a Division Chief at HQS, supervising a deputy, two branch chiefs, and approximately 50 personnel involved in supporting sensitive operations.

55.     On 18 April 2013 an Agency manager responsible for evaluating applicants for the above position advised Markson (via Agency email) that he was, by far, the manager's "top pick" (Exhibit 10; Exhibit 15, page 9).

56.     On 21 May 2013 Markson was notified that he had not been selected for above position. On 28 May 2013 Markson asked the handling personnel officer and defendant Colin S. for feedback regarding his non-selection (Exhibit 11). This request was never answered.

57.     In discussing Markson's application for the above position, defendant Carl G., who led the selection panel, has asserted that it was the unanimous opinion of the selection panel that Markson was not qualified for the position (Exhibit 12, page 6).   Carl G. had reviewed Markson's manuscript (Exhibit 12, page 4) and was aware of the punitive actions taken against Markson, but has sworn this had no impact on his or the panel's decision.

58.     Contradicting Carl G.'s assertion that Markson was not qualified for the above position, Defendant Colin S. and Personnel Officer Patricia P. have advised in sworn statements that Markson was considered/presumed qualified for the above position  (Exhibit 13, page 6; Exhibit 14, page 10).  Carl G.' assertion that Markson was not qualified for the position is also contradicted by the comments of one of the managers of this position, who had ranked Markson as the top candidate (Exhibit 15, page 9), and the fact that Markson had favorably executed virtually identical duties for a period of approximately 7 years.

59.     On 25 April 2013, Markson applied for a managerial foreign field assignment.  At the time, Markson was a Division Chief at HQS, supervising a deputy, two branch chiefs, and approximately 50 personnel involved in supporting sensitive operations.

60.     On 17 May 2013 Markson was interviewed for the above position by three senior managers, including defendant Mark P (Exhibit 16).  During the interview, the prospective managers revealed their knowledge of Markson's submission of a draft fictional manuscript to the PRB, and the resulting subsequent disciplinary action.  In this context, Mark P. asked Markson how he thought he could be eligible for the above position given his disqualification from his former assignment.  Markson was not selected for this position.

61.     In a sworn statement dated 20 September 2013, defendant Mark P. acknowledged that he had solicited information regarding Markson's manuscript and rescission of a prior CIC

assignment from an unidentified prior supervisor of Markson. The unidentified supervisor

advised Mark P. that Markson had an "issue" with the PRB that had "ended in an altercation on

the 7th floor, with (Markson) demanded to see D/NCS." (Exhibit 16, pages 10-11)

62.      Defendant Mark P. has acknowledged that Markson's actions in drafting a

manuscript, causing an alleged altercation at the office of the D/NCS, and the rescission of his

CIC assignment, had all given birth to concerns regarding Markson's integrity, judgment, and

suitability. These concerns were the "key determining factor" in Mark P.'s recommendation that

Markson not be considered for the position (Exhibit 16, page 8).

63.      On 30 April 2013 Markson applied for a domestic managerial field assignment.

At the time, Markson was a Division Chief at HQS, supervising a deputy, two branch chiefs, and

approximately 50 personnel involved in supporting sensitive operations. While there was no

statement of required experience or specific qualifications contained in the vacancy notice for the

above position, Markson met or exceeded all generally-accepted standards for such a

management position.

64.      On 17 May 2013 Markson received notice from defendant Colin S. advising that

he had not been selected for the above position; the note offered no other information regarding

the position. Markson subsequently learned that, on the very same day he had been notified of

his non-selection, the position was re-advertised with no material changes in the vacancy notice.

On 28 May 2013 Markson asked the handling personnel office and defendant Colin S. for

feedback regarding his non-selection (Exhibit 11); this request was never answered.

65.      In discussing Markson's application for the above position, defendant Carl G.,

who led the selection panel, has asserted that it was the unanimous opinion of the selection panel

that Markson was not qualified for the position (Exhibit 12, page page 15). Carl G. had reviewed

Markson's manuscript (Exhibit 12, page 4) and was aware of the punitive actions taken against Markson, but has sworn this had no impact on his or the panel's decision.

66. Markson met all requirements noted in the vacancy notice but was reportedly not chosen as the best candidate. When the chosen candidate declined the assignment, the position was re-advertised rather than assigning it to Markson and/or notifying him that the position had become competitive again.

## THE DRAFT MANUSCRIPT

67. The Publication Review Board ["PRB"] is the Central Intelligence Agency's internal body responsible for reviewing proposed manuscripts that CIA employees desire to publish. This Board is governed by Agency regulation AR 6-2 (Exhibit 25).

68. After receipt of Markson's draft manuscript on 22 May 2012, as part of the normal review process, the PRB sent said manuscript to Markson's immediate supervisor, Jeffrey E., an expert with over 20 years of experience in the specific type of field operations discussed in the fictional novel. The PRB asked Jeffrey E. to read the manuscript and advise whether it contained any classified information, and/or whether publication could reasonably be expected to impair Markson's ability to perform his duties, interfere with the authorized functions of the CIA, or have an adverse impact on the foreign relations or security of the U.S.

69. On 07 June 2012 Jeffrey E. responded (Exhibit 17) to the above tasking advising that the manuscript contained no classified information, although there were approximately six citations that, while not classified, might be changed to better protect Agency equities. To all other questions presented by the PRB, Jeffrey E. simply responded in the negative.

70. On 29 June 2012 defendant Karen P. sent an email to Markson's immediate supervisor, Jeffrey E., asking if any of the operations discussed in Markson's manuscript "rang

true" with any of Markson's genuine work activities.  On the same day Jeffrey E. responded that no, they did not ring true with his actual work activities.  (Exhibit 18).

71.      On 05 November 2012, the PRB sent Jeffrey E. an email (Exhibit 19) asking "Are instances of tradecraft (word deleted) methods used in the manuscript  specific or detailed enough that would lead an audience to believe the manuscript was true to life?"  In response to the above, Jeffrey E. answered the presented question "no".  He further explained to the PRB that tradecraft discussed in the book was too basic or inappropriate to be confused with true life. He commented that the actions of manuscript's protagonist, which included black bag jobs, domestic surveillance, and criminal trespass, were expressly forbidden and/or illegal  (Exhibit 19).

72.      In the background, and unbeknownst to Markson, emails were being circulated around NCS, and with Karen P., speculating that the manuscript was partly "autobiographical." This was based upon the main character's sometimes contentious and frustrating relationship with another fictional character, one of his supervisors.

73.      On 20 August 2012, defendant Richard P., Chairman of the PRB, sent Markson an initial determination denying permission to publish his manuscript (Exhibit 20).  The denial cited approximately six instances of alleged classified information.  These matched those citations highlighted by Jeffrey E (Exhibit 17), who had not said they were classified, but merely suggested these citations might be changed to better protect potential Agency equities.

74.      One of the items cited as "classified" in the above finding was the term "eyes-only".  This term is clearly evident in (Exhibits 3, 4, and 6), which the Agency itself has since deemed unclassified.

75.     In the above denial, defendant Richard P. also stated that the PRB considered the book to be an autobiographical work of non-fiction, which subject it to more stringent reivew standards (Exhibit 20).

76.     On 07 September 2012, Markson filed a reconsideration of the above decision (Exhibit 21), focusing initially on the board's determination that the book should be treated as "non-fiction." Markson underscored that the plot and all material developments in the book were fiction, and welcomed any specific questions if the PRB believed certain text might correlate to real events. Markson asserted that, as the events were fiction, by definition they could not be classified. However, Markson re-wrote two of the cited sections to better protect potential Agency equities as suggested by Jeffrey E. On the other citations Markson provided extensive documentation specifying where the allegedly classified material had been published in prior works of fiction and non-fiction (Exhibit 21, pages 10-11).

77.     The PRB also opined that publication of anything, at all, would be inappropriate for a current staff employee, and could impair the performance of duties by Markson and/or the Agency. In response to this opinion, Markson highlighted a precedent where a similarly-situated employee had authored 5 similar novels during the period of 1991-1998. Markson also highlighted that he had planned to use a pen-name in authoring the manuscript, just as his predecessor had done in above precedent. Markson also offered to have any potential publishing agent sign a non-disclosure agreement to ensure his affiliation with the U.S. Government was not revealed (Exhibit 21, page 4).

78.     In closing his request for reconsideration, Markson noted that his onward assignment had been cancelled as a direct result of having submitted the manuscript for PRB review. Markson asserted that this personnel action constituted a second, unofficial and

unsanctioned form of review that undermined and usurped the PRB's authority, constituting a form of double jeopardy for aspiring authors (Exhibit 21, page 9).

79.    On 03 October 2012 the PRB responded to the reconsideration request (Exhibit 22). Mr. Markson's specific points were summarily ignored and not addressed. Without further specifying what material was classified, as required by Agency regulation, the manuscript was declared classified in its totality. Without providing any substantiation, and despite direct evidence to the contrary, the board further asserted that the use of pen-name for the book would actually increase attention to the book and thus inhibit Markson in the performance of his duties. The PRB asserted that Markson's manuscript had not been "rewritten enough", and ventured into speculation as to the economic viability of Markson's manuscript if they were to specify all the material they considered classified.

80.    On 18 October 2012 Markson personally met with three PRB members involved in the review of the manuscript, including defendants Richard P. and Karen P. Karen P. served on the PRB as the representative of Markson's career service, the National Clandestine Service [NCS] ( Exhibit 23, page 2).

81.    During the meeting Karen P. suggested Markson should retire if he wanted to publish the manuscript, stating "why don't you just retire?." In the same meeting Karen P. stated that Markson's continued appeal of PRB findings would not be viewed favorably by senior NCS management (Exhibit 23, pages 6). In a subsequent sworn statement dated 23 September 2013 Karen P. confirmed making the above comment and further volunteered that in her five years of service with the PRB no Agency employee had ever successfully challenged a PRB finding (Exhibit 24, pages 8-9).

82.    On 12 November 2012 Markson filed a request for reconsideration of the PRB's

second finding (Exhibit 23). He specifically requested the PRB conform to governing

regulations (Exhibit 23, pages 3-4) when making determinations regarding his manuscript. He

requested they specifically identify the material asserted to be classified, as well as the

envisioned harm to national security by proposed publication. Markson offered to change any

damaging text and thus avoid any harm to national security but noted that, at that point, it was

impossible for him to do so because the Board had not specifically identified the offending text.

83.    On 29 November 2012 the PRB advised that, within the context of the Markson's

most recent request for reconsideration, they had sent his manuscript back to the NCS for further

consideration.

84.    On 11 April 2013 Markson queried the PRB as to the status of the review and

received no response.

85.    On 18 April 2013 Markson again queried the PRB regarding the status of the

review. On 19 April 2013 the PRB responded and advised that that the manuscript was still

under review, but volunteered that they had reconsidered their approach, and hoped to have a

response in a week or two.

86.    On 17 May 2013 Markson queried the PRB regarding the status of the review and

noted his availability to answer any questions the Board might have. The PRB did not respond

to the inquiry, nor pursue the above offer.

87.    On 04 June 2013 Markson inquired as to the status of the review, highlighting that

the one year anniversary of his initial submission had recently passed. On 05 June 2013 the PRB

responded to the above inquiry, advising a new NCS representative would be handling the

review, and was pursuing a new approach to Markson's manuscript that would <u>not</u> involve a full denial. A decision was expected the following week.

88.    On 18 June 2013 the PRB sent Markson an unsolicited note advising that his manuscript was still under review and identified the new NCS representative on the PRB as Donald R. In response, on 19 August 2013 Markson sent a note to Donald R. offering to meet and/or answer questions. Markson received no reply to above offer.

90.    On 15 January 2014, 18 months after initial submission of this draft fictional manuscript, the PRB sent Markson a redacted version of his manuscript, asserting that approximately 5,000 words (approximately 4% of the manuscript) had been deemed classified or unsuitable for publication by a current staff employee. Markson was advised he had a maximum of 30 days to appeal the finding.

91.    The majority of the text deemed classified in the above finding involved any text that might reveal the location of fictional events described in the manuscript. This finding was based on the PRB's continued treatment of the manuscript as a work of non-fiction. As a result, words such as "conch fritters", "dog track", "tropical breeze", "mangrove swamp" and the names of any city, county, state, or geographic location, was redacted as "classified." Associated with above, the names of various businesses and establishments, some of which have <u>never existed</u> and were wholly made up, were also deemed "classified".

92.    There were however other items deemed classified without <u>any</u> apparent basis in reason. The well-known Securities Exchange Commission 10-k reporting form was deemed classified. A basic geometric design that was used in the context of a surveillance detection route was deemed classified. This same term however, used in the exact same context, was

approved by the PRB (as evident on page 140 of the book "Red Sparrow") at the same time it was stricken as classified in Markson's manuscript.

93.    As to appropriateness issues, at the same time Markson was being denied permission to publish his manuscript, another Agency staff employee published the book "Red Cell", a thriller about a penetration of the Chinese government. The author acknowledges his book was informed by his work within a genuine "Red Cell" team at the CIA created by former Director of the CIA, George Tenet. The author of "Red Cell" however did not work for the NCS but rather the Directorate of Intelligence, which appears not to be subject to dictums of Mark K. and the NCS.

94.    Between 17 January and 12 March 2014, Markson was in contact with the PRB eight (8) times in an effort to arrange a meeting to discuss the reasoning and basis for the PRB's most recent opinion. The PRB cancelled or changed three different scheduled meetings.

95.    On 12 March 2014 the PRB finally met with Markson. Attending the meeting were defendants Richard P. and Donald R., as well as PRB employee Lori D. During the meeting Markson confirmed that the PRB did, in fact, understand that the events, locations, and facilities discussed in the book were fictional and made up.

96.    Richard P. indirectly acknowledged an understanding of above, but explained that, in the past, employees had attempted to "game" the system by presenting real events and locations as fiction through minor manipulation and veiling. Markson denied that he was engaged in such an effort and noted that the PRB had held the manuscript over 18 months; if the PRB had any such questions, Markson had repeatedly made known his availability to answer same.

97.     During the same 12 March meeting, noting the seriousness of declaring a fellow citizen's intellectual property to be classified, Markson asked the PRB members, per their own governing regulations, what specific classification authority they were exercising in deeming the text of his manuscript classified.  More specifically, Markson inquired if the Board was applying original or derivative authority and, if the latter, which specific Agency sub-group of classified citations were they exercising per the PRB standards and regulations.  In response, the Board members could not, or would not, provide an answer.

98.  Harm to national security is at the core of each and every classification decision, and all Agency employees are required to undergo annual training in the application of such decisions.  Governing regulation AR 6-2 (Exhibit 25, page 9) required the PRB to specify in writing the specific harm that would reasonably be expected to arise from publication whenever they determined cited text to be "inappropriate" for publication by an Agency staff employee.  Throughout three denials and 20 months of review, the Board had never provided Markson with the required written justifications.  During the 12 March meeting, for each citation deemed "classified", Markson asked the Board members what specific harm they envisioned to the nation's security as a result of the proposed publication of the redacted text.  Yet, in response to each and every one of the above questions, the board was unable, or refused, to answer these most basic questions.

99.     On or about 25 March 2014, Markson submitted an appeal to the PRB's third and most recent denial of permission to publish his manuscript.  In this document Markson detailed the lack of basis for each and every finding of "classified" or "inappropriate" information alleged to be in his manuscript.  He noted that the PRB had consistently refused to comply with governing regulation AR 6-2 (Exhibit 25, page 9) for over 18 months.

100.    Executive Order 13256 (Classified National Security Information: 29 December 2009) specifically instructs that, in cases where there is significant doubt as to the potential threat of harm to national security, the material was not to be deemed classified.  Markson therefore further alleged that the PRB, in partnership with the NCS, was not only violating Agency regulations, Federal laws, and the U.S. Constitution, but also the above multiple Executive Orders.

101.    As of the date of this complaint, there has been no Agency response to the Markson's most recent appeal.

102.    Each time the PRB sends an individual a copy of a submitted manuscript, it is accompanied by a strict privacy warning that the document is proprietary, subject to copyright laws, and may not be further distributed without the explicit approval of the Chairman of the PRB (Exhibit 26, page 47).  The lead PRB reviewer for Markson's manuscript, Lori D., has stated that such a warning accompanied every copy of the manuscript she sent out (Exhibit 26, page 5).

103.    Defendant Karen P. has indicated she forwarded copies of the manuscript to three people: Executive Officers of two NCS divisions and the attorney of the Counterterrorist Center (Exhibit 24, page 5).  PRB lead reviewer Lori D. has stated she forwarded copies of the manuscript only to one person: Markson's immediate supervisor, Jeffrey E., whom she considered a Subject Matter Expert (Exhibit 26, page 9).

104.    In contradiction to Agency regulation and above privacy warnings, multiple defendants appear to have passed the manuscript throughout the NCS without proper authority. The attached exhibits (such as Exhibit 2, pages 26, 28) indicate the document was improperly

33

shared with, and reviewed by, defendant Larry N. Exhibit 2, page 29-31, indicates the manuscript was forward to multiple individuals whose names have been redacted. Exhibit 2, pages 32-33, indicates the manuscript was shared with defendant Colin S. and a significant number of other officers whose names have been redacted. Exhibit 12 indicates the manuscript was reviewed by defendant Carl G. In Exhibit 13, page 11, defendant Colin S. states that Markson's "submission of a manuscript for publication review is well known."

## PLAINTIFF'S EFFORTS TO OBTAIN REDRESS

105.    Each and every CIA employee has sworn an oath to honor and defend the Constitution of the United States. As documented above, Markson has specifically and repeatedly been denied basic rights guaranteed by the United States Constitution. When he patiently sought redress from multiple CIA managers, the wrongs were only reinforced and multiplied, with said managers not only abdicating their responsibilities to defend the Constitution, but conspiring to further deprive Markson of his Constitutional rights.

106.    As noted above, on 29 June 2012 Markson was summoned to his agency's Headquarters and advised by defendant Paul S. he had been terminated from his onward assignment upon the authority of defendant Mark K. The stated reason for this action was that the mere act of having submitted a draft manuscript to the PRB, despite through proper Agency channels and per all known and published rules and regulations, had caused sufficient concerns regarding Markson's judgment to warrant cancellation of the onward assignment.

107.    Immediately following the above 29 June 2012 meeting, Markson went to the office of Senior CIA Executive John D.B., who was Director of the NCS (D/NCS) as well as supervisor of Senior Managers Mark K. and Paul S. Markson met with the D/NCS Chief of

Staff in a meeting where Markson's actions have been described as **reasonable** and **professional** (Exhibit 2, page 47).

108.     On 06 July 2012, Markson sent an email to the Chief of Staff, with further context and background regarding his drafted manuscript, the termination of his onward assignment, and his request that the D/NCS reverse this personnel action (Exhibit 27).  This email was never answered and the office of the D/NCS took no further action in response to Markson's appeal for redress.

109.     Rather, on 28 November 2012, defendant John D.B.,  D/NCS, stated that he supported the actions of Mark K. in cancelling Markson's onward assignment, and further advised that Markson would not be considered eligible for any future assignment to CIC (Exhibit 9).

110.     Given the failure of management to engage with Markson regarding his complaints, on 10 July 2012 Markson submitted a formal grievance regarding above developments to the NCS grievance officer within the Agency's Center for Mission Diversity and Inclusion (CMDI).

111.     On 16 July 2012, Markson followed up on his initial grievance and was advised by the NCS Grievance Officer at the CMDI that the complaint had not been received via the privacy channels established by the Agency.  At the request of the Grievance Officer (Exhibit 28), Markson subsequently sent the grievance, in its entirety, via an internal Agency email (Exhibit 29), and received confirmation that the complaint had been received.  The above email, and all subsequent related communications, were subject to monitoring by Markson's second-level supervisor, Larry N., who, as noted above, made unsubstantiated derogatory comments on Markson's annual evaluation on 27 July 2012.

112.    In Markson's above complaint to the CMDI he specifically documented how the personnel actions taken against him were inequitable, unwarranted, unreasonable, and an abuse of authority that violated basic constitutional guarantees (Exhibit 29). Markson requested an immediate reversal of the rescission of his onward assignment.

113.    On 25 July 2012, Markson received an internal agency email from the NCS Grievance Officer at the CMDI advising that his complaints did not constitute a grievance under governing agency regulations (Exhibit 30). In explaining above decision, the grievance officer noted that grievances generally came down to the issue of violating specific Agency policies and regulations.

114.    On 02 August 2012, Markson responded to the CMDI, re-stating his grievance in terms of specific CIA rules and regulations that had been violated (Exhibit 31). In this re-statement, Markson specifically identified multiple violations of 7 different Agency regulations, as well an associated Executive Order, the Privacy Act of 1974, and possible copyright laws. Markson also reiterated his allegation that the actions of Senior Mangers Mark K. and Paul S. were in violation of the First Amendment of the U.S. Constitution and established an unwritten rule that NCS/CIC employees were not allowed to author any work, regardless of whether it was fiction or non-fiction, and/or whether it was done in compliance with Agency regulations (Exhibit 31).

115.    The above re-stated complaint was received by Carmen M., Director of the CMDI on 03 August 2012 (Exhibit 32).

116.    On 10 August 2012 Markson exchanged internal Agency email correspondence (Exhibit 33) with Amanda M., an attorney employed by the Agency's Office of General Counsel (OGC). Said OGC representative indicated their Office was conducting a review into methods

to best protect classified information and part of this review included inspection of the processes employed in the pre-publication review.

117.     In the email to Amanda M., Markson opined that he was being subjected to retaliatory censorship and, despite the fact that he had complied with all Agency regulations, the NCS and PRB were applying an un-written ruled that was aimed at discouraging employees from even considering the exercise of their constitutional rights. OGC Attorney Amanda M. expressed no interest in Markson's allegations.

118.     On 09 August 2012, the NCS Grievance Officer at the Agency's CMDI responded (Exhibit 34) to Markson's re-stated grievance, advising that it was still the CMDI's determination that Markson's complaints did not "fall within the grievance system." In the correspondence, the Grievance Officer noted that he had conferred at length with the Director of the CMDI, Carmen M.

119.     Under Agency regulation, the CMDI is the only forum for grievances by Agency Officers and the D/CMDI, in this case defendant Carmen M., has sole authority to determine what constitutes a grievance under the CMDI's jurisdiction. Once made, this decision is final and not subject to further appeal within the Agency.

120.     On 13 August 2012 Markson submitted a report to the CIA Inspector General (IG) that basically repeated and expounded upon the facts made in his above grievance to the CMDI. Markson expanded on multiple acts of unethical, unprofessional, and illegal behavior by multiple senior Agency officers. Markson specifically identified violations of multiple agency regulations as well as the United States Constitution.

121.     Nine months later, on 16 May 2013, OIG Investigator Valerie C. responded to Markson's report.  The OIG indicated it had reviewed the Markson's allegations and not found sufficient information to warrant investigation.

122.     On 13 November 2012, in response to PRB suggestions that he retire, and in the absence of any plausible legal explanation for the actions taken against him, Markson filed a complaint alleging age-related discrimination.  The results of the ensuing investigation were provided to Markson.  They make clear the basis and intent of punitive actions taken against him were not likely due to his age, but were instead a transparent and concerted effort to prevent him from exercising his constitutional right to free speech, and concurrently intended to cast a chill over any similarly-situated officer who might be considering the same action.

## OTHER RELEVANT FACTS

123.     Agency precedent supports pursuit of authorship of fictional work similar to an employee's work duties.  The existence of Agency regulations (Exhibit 25) regarding the review process for such manuscripts indicates such authorship is expected and anticipated.

124.     Between 1991 and 1998, an Agency employee holding an identical position to Markson's is, on information and belief, believed to have published 6 fictional novels without adverse consequences.  The names of the books, as well as both the pen name and true name of the author, can be made available to the Court pending CIA approval.

125.     The above employee published the novels under a pen-name, as had been proposed by Markson.  One of the above novels involved a plot line involving fictional counterterrorist themes pursued by a fictional intelligence officer, similar to those in Markson's manuscript.

126.     Precedent of foreign intelligence officers writing fictional novels while they are employed with their Service are abundant and include some of the best writers in the genre, including John Le Carre, Ian Fleming, Graham Greene, John Buchan, and Somerset Maugham.

127.     As noted previously in this complaint, Agency staff employee Mark Henshaw published the book "Red Cell" at the same time Markson was seeking to clear his book through the PRB. Henshaw's book involved the much more sensitive issue of a penetration of the Chinese government and he acknowledges that the book's origin was in a genuine "red cell" team that he worked at within the Agency. A significant difference when compared to Markson, is that Henshaw worked in the Directorate of Intelligence and was presumably not subject to the un-written NCS dictums enforced by defendants Mark K. and Paul S.[3] This book, like Markson's, is a matter of public interest.

128.     In 2014 recently retired NCS officer Jason Matthews was granted permission to publish the book "Red Sparrow", a thriller about interaction with the Russian Intelligence services. On page 140 of this book, Matthews uses a word describing a surveillance detection

---

[3] "The book "Red Cell" (*ISBN 978-1-4516-6193-4* ) was authored by CIA Intelligence Analyst Mark Henshaw and published in 2012. According to a Washington Post review dated 13 July 2012, "The thriller describes real CIA offices and units, including Red Cell, where Mr. Henshaw himself served for three years, and the spy tradecraft is real - up to a classified point. Likewise, the American and Chinese military units and tactics are accurate. The novel also covers true historical events like the Tiananmen Square massacre and the 2001 aloft collision of an American EP-3 signals reconnaissance aircraft and a Chinese interceptor fighter aircraft. This realism adds to the suspense and believability of the story." This book, like Markson's, is a matter of public interest." *Review available at:*
http://www.washingtontimes.com/news/2012/jul/13/book-review-red-cell/?page=all

maneuver that, in the exact same context when used by Markson, was deemed "classified" by the PRB.[4] This book, like Markson's, is a matter of public interest.

129.    The cumulative intent and impact of the various NCS and PRB actions cited above was to establish a derogatory dossier on Markson as part of what is known within the CIA as a "Hall File". This unwritten dossier is spread informally but used extensively and given great weight. The hall file is evidenced in the comments of Mark P. (Exhibit 14, pages 10-11) when he was provided inaccurate and derogatory information on Markson prior to a job interview. The existence of this pernicious informal personnel system is further confirmed by the comments of CIA Executive Ralph G. (Exhibit 35, page 3). It is also implicit in the decision of the multiple senior managers, who failed to document their charges against Markson in any form of official personnel file.

## PLAINTIFF'S DAMAGES

130.    The actions of the Defendants have caused significant damage to Plaintiff. As a result of defendants' actions depriving Markson of his First Amendment rights of freedom of speech, his due process rights, his right to equal protection of the law, his right against

---

[4] "The book "Red Sparrow" (*ISBN 978-1-4767-0612-2*) was authored by retired CIA senior NCS officer Jason Matthews and published in 2013. According to the author of a New York Times review dated 31 May 2013 " I have rarely encountered a nonfiction title, much less a novel, so rich in what would once have been regarded as classified information. From dead drops to honey traps, trunk escapes to burst transmissions, Matthews offers the reader a primer in 21st-century spying. His former foes in Moscow will be choking on their blinis when they read how much has been revealed about their tradecraft. The author's unrelentingly bleak depiction of the post-Soviet espiocracy also rings depressingly true." The book, like Markson's is a matter of public interest. *Review available at:* http://www.nytimes.com/2013/06/02/books/review/red-sparrow-by-jason-matthews.html?_r=0

unreasonable search and seizure, and his privacy rights, Markson has suffered extensive damages, to wit.

- He has been prevented from publishing his book;

- The economic value of his publication has been substantially destroyed.

- Markson's coveted foreign assignment position was cancelled,

- he was deprived of the opportunity to secure other coveted assignments for which he was well qualified,

- his reputation in the agency was impugned,

- he has suffered a resulting loss of freedom in his chosen career,

- he has incurred mental anguish and emotional pain, and stress-related medical problems.

## FIRST CAUSE OF ACTION
## VIOLATIONS OF FIRST AMENDMENT RIGHTS

131.    Plaintiff repeats and re-alleges the statements contained in paragraphs 1 through 130 above, inclusive.

132.    The first amendment of the U.S. Constitution guarantees all citizens the right to freedom of speech and specifically precludes prohibition of the free exercise of said right.  U.S. CONST., AMEND I.

133.    Defendants violated Markson's First Amendment right to free speech in two respects: a) they punished him with adverse employment actions for the mere act of speech, that is, drafting a manuscript; and b) the CIA Publication Review Board ("PRB") denied him his right to free speech through their illegal and adverse review process.

A) Adverse employment actions in retaliation for exercising right of free speech

41

a. Defendants John D.B., Mark K., Paul S., and Larry N., among others, have explicitly admitted to terminating Markson's employment assignment for the sole reason that he simply drafted a manuscript. This was notwithstanding the fact that Markson's supervisor was aware of and condoned his writing, and Markson submitted it for review to the PRB in accordance with all Agency regulations. As indicated within, the termination decision was directly intended to prohibit Markson from drafting any manuscript at all related to the world of intelligence, whether fictional, non-fictional, and disregarding whether publication would have any impact on matters of national security.

b. The defendants have created a secondary, unwritten and unauthorized set of standards for employees of the NCS division, imposing illegal barriers on expression of free speech. The unwritten policy is evident in Mark K.'s statement that "serving Clandestine Service Officers do not write manuscripts intended for publication . . ." (Exhibit 2, page 9).

c. The defendants' unwritten and illegal policy is not related to national security or any potential impact on the performance of official duties. The manner and timing of punitive actions taken against Markson make this particularly clear. At the time the defendants revoked Markson's onward assignment there had been no determination made by the PRB regarding the content of the manuscript. In fact, the only response submitted to the PRB and NCS at that time had come from an expert specifically tasked to review the manuscript. This expert indicated the fictional manuscript contained no classified information and would not impair the performance of anyone's duties. Defendant Larry N. even

admitted that, pursuant to his unauthorized review of Markson's manuscript, there was no indication of compromise to any Agency offices, officers, or corporations.

d. At the time of their actions, Defendants were fully aware that the vital premise of their termination decision (whether Markson was attempting to publish something classified and inappropriate in violation of Agency regulations) was outside the scope of their authority and was the sole responsibility of the PRB. Defendants were aware the actions they were taking violated protected Constitutional privileges, as evidenced by Paul S.' comments that he did not want to talk about plaintiff's constitutional rights. Despite the above, the Defendants willfully proceeded to violate Markson's First Amendment rights by punishing him for merely writing – not publishing- a novel.

e. Further, Defendants John D.B., Mark K., Paul S., and Larry N., among others, directly caused Markson to suffer ongoing adverse employment consequences, including loss of at least three job prospects, exclusion from an entire class of sensitive positions he was well-qualified for, as well as damage to his reputation. This was done through circulation of an unofficial, off the record, "hall file." The existence of this damaging "hall file" has been established and referred to by defendants in a multitude of sources, attached as exhibits.

f. Upon information and belief, the actions of Defendants which resulted in violation of his First Amendment rights were undertaken, in part, due to personal animus against Markson and the belief that Markson had the potential to portray the CIA, and fictional characters who worked in the CIA, in a

negative light.  Defendants would not tolerate this type of criticism in written form and acted directly and with intent to prevent him from exercising his right to speech.

B) CIA Publication Review Board's ("PRB") denial of Markson's right to free speech through their illegal and adverse review process.

    a. Through the actions described in the factual summary within, the CIA's Publication Review Board (PRB), including but not limited to defendants Richard P., Karen P., and Donald R., have violated Markson's constitutional right to free speech and have abused the trust and power of their Office.  Acting outside the scope of their authorities and governing CIA regulations, the defendants issued a series of conflicting opinions, all intentionally aimed at preventing the publication of Markson's manuscript.

    b. Defendants violated the governing rules and regulations of the CIA, devised improper and illegal standards for publication review, and intentionally delayed plaintiff's petitions.  Defendants initially ruled that Markson's fictional manuscript was classified in its entirety, a claim that flies in the face of any reasoned assessment.  However, in their first two opinions, the defendants failed to identify, as required by Agency regulation, the specific text they claimed to be classified and/or inappropriate for publication by a staff employee.  Instead, they asserted the manuscript, in its totality, consisted of only classified or inappropriate information, a determination that cannot withstand any reasonable scrutiny.

c. When, after almost two years, the defendants did finally identify specific text deemed objectionable, they treated wholly fictional events and locations as though they were factual and real life. There is no legal or regulatory basis for the above usurpation of regulatory power.

d. Defendants have demonstrated contempt for existing regulations, laws, and rights, repeatedly ignoring Markson's request that they conform to Agency regulations. Even to the date of this complaint, the defendants have failed to comply with Agency regulation requiring they specify, in writing, how they reasonably envision execution of official duties would be impaired for each and every citation where they assert that publishing of said material is inappropriate for a staff employee. As a direct result of Defendants' actions, Markson has been unable to exercise his First Amendment right of free speech.

C) The Defendants were fully aware that their actions were outside the scope of their authority and, despite repeated pleas for equity and conformance to regulations, willfully persisted in the behavior. While the Defendants lacked any legitimate authority for their actions, said actions were taken under the complete color of law. The individual defendants, in their conduct described herein above, have exercised the authority and power of the CIA, the agency they worked for.

D) Through these actions, over a course of two years, defendants have intentionally held Markson's manuscript ransom, and willfully denied Markson his constitutional right to free speech. Markson accordingly begs the court for consideration of the above Constitutional violations in accordance with the Bivens doctrine. *Bivens v. Six Unknown Named Agents*, 403 U.S. 388, 397 (1971).

E) As a direct result of these constitutional violations, Markson has suffered extensive
damages, to wit:  Markson's coveted foreign assignment position was cancelled, he was
deprived of the opportunity to secure other coveted assignments for which he was well
qualified, his reputation in the agency was impugned, the economic value of his
manuscript has been substantially destroyed, and he has suffered a resulting loss of
freedom in his chosen career, mental anguish and emotional pain, and stress-related
medical problems.

## SECOND CAUSE OF ACTION

## VIOLATIONS OF FIFTH AMENDMENT DUE PROCESS

134.    Plaintiff repeats and re-alleges the statements contained in paragraphs 1 through
130 above, inclusive.

135.    The Fifth Amendment of the U.S. Constitution guarantees that no citizen shall be
deprived of life, liberty or property without the due process of law.  U.S. CONST., AMEND V.

136.    Defendants, acting under the color of authority of the CIA, violated Markson's
Fifth Amendment right to due process in multiple respects: a) he was punished for attempting to
exercise his First Amendment rights with multiple adverse employment actions, yet was
provided no opportunity for notice or any type of hearing or challenge; and, b) ; his attempts at
seeking redress through Agency channels such as OIG and CMDI were summarily thwarted.

A) Deprivation of Procedural and Substantive Due Process Through Adverse Employment
   Actions

   a.   Defendants including but not limited to John D.B., Mark K., Paul S. Larry N.,
        Colin S, John R.B., Carl G., and Mark P., deprived Markson of significant liberty

and property interests while intentionally denying him any opportunity for due process.

b.   Mark K. caused the cancellation of Markson's foreign assignment. This action was predicated upon the unauthorized and prejudiced assessment of Markson's manuscript by defendants Larry N. and Colin S. As a result, Mark K. made the ill-informed snap judgment - before the experts at PRB had even weighed in –that merely drafting this fictional manuscript made Markson unfit for the overseas position. This opinion was circulated by word of mouth around the NCS (National Clandestine Service) division behind Markson's back and without his immediate knowledge. As the attached exhibits definitively demonstrate, Markson was concurrently precluded from possible employment within an entire class of sensitive NCS assignments based on that opinion.

c.   The above actions were taken with the full knowledge that Markson had complied with all relevant rules and regulations. The only authorized review of Markson's manuscript as of the time of Defendants' above decisions indicated that the manuscript contained no classified or inappropriate material. The termination decision was made despite, and in contempt of the fact that the government has established a separate and sufficient system to address all potential security issues associated with possible publication of Markson's fictional manuscript.

d.   The above decisions were summarily made by the Defendants contrary to Agency personnel policies, without benefit of consideration by a personnel panel per Agency policy, and without affording Markson the opportunity to confront and rebut the allegations and decisions. Defendants intentionally acted in a manner

that was un-documented and un-appealable. There was never any documentation in Markson's personnel file of Mark K., John D.B., or Larry N.'s assessments/allegations that Markson had displayed a serious lack of professional judgment. The defendants took their action and inflicted the damage appropriately confident, as justified by subsequent events, that Markson's ability to appeal the decision within the Agency was nil.

e.  In addition to the above personnel actions, Defendants conspired to establish and propagate a derogatory "hall file" regarding Markson that would serve as a more persistent obstacle to his career progression and/or any future attempts to exercise his constitutional rights. As noted in the statement of facts, the existence of this "hall file" system within the CIA has been confirmed through the comments of a Senior Agency Executive (Exhibit 35) as well as, among others, the sworn comments of Defendants Colin S., Mark K and Mark P.

f.  The well-known and untrue contents of this "hall file" include, among other things, a malicious rumor of an "altercation on the 7th floor." Markson has been denied any opportunity to confront and rebut the allegations of the hall file, but it weighs as importantly, if not more so, than the accurate contents of his genuine personnel file.

g.  In addition to the above personnel actions, Defendants including, but not limited to Carl G., Colin S., Mark P., Larry N., John R.B., Mark K., and John D.B. knowingly and willfully denied Markson of significant property and liberty interests, including gainful employment opportunities, predicated on

unsubstantiated, unwritten, illegal, and discriminatory criteria, while concurrently and intentionally denying Markson any opportunity for due process.

h.  Specifically, in 2013 Markson applied to three positions under the selection authority of the above defendants. Markson was uniquely qualified for each and every one of the positions. Rather than conduct a fair and equitable evaluation of his qualifications however, Defendants summarily excluded Markson from consideration based on the negative "hall file", the contents of which Markson was never provided, nor given the opportunity to confront and rebut. At least one defendant, Mark P., has admitted to obtaining the hall file from one of Markson's former supervisors, and said it was a determining factor in not selecting him for the assignment. The decisions were made despite, in at least one case, Markson being considered the best candidate for the position.

i.  Each of the Defendants engaged in the above actions under color of federal law knowing that plaintiff would lack any forum for redress. The individual defendants, in their conduct described herein above, have exercised the authority and power of the CIA, the agency they worked for. Through these actions, over a course of two years, Defendants have willfully violated Markson's procedural and substantive due process rights, and Plaintiff accordingly begs the court for consideration of the above Constitutional violations in accordance with the Bivens doctrine.

B) Deprivation of Avenues of Redress for Above Adverse Actions

a.  Defendants including, but not limited to, John D.B., Carmen M., David Buckley, and Valerie C., violated Markson's Fifth Amendment rights by abdicating the

responsibilities of their Office and deliberately applying inequitable and unpredictable criteria in the handling of CIA employee grievances.

b. The Agency grievance system, in the form of the Center for Mission Diversity and Inclusion (CMDI), is charged with serving as the primary mechanism of redress for employees who have suffered abuse and discriminatory practices in the workplace. As noted in the above statement of facts, a CMDI representative has described the charter of this Office as ensuring fair and equitable compliance with Agency rules and regulations.

c. Among other duties, the CIA's Office of Inspector General (OIG) is charged with ensuring that CIA activities are conducted in full compliance with relevant laws and regulations. The OIG is also designated as point of last resort when Agency employees believe they have been the subject of malicious and illegal management behavior and/or have been otherwise denied redress.

d. As reflected in the statement of facts, Plaintiff Markson has briefed defendants within the CMDI and OIG in significant and specific detail regarding multiple violations of CIA regulations and policies, as well as violations of federal law and the U.S. Constitution. In these written reports, Markson has provided clear and compelling evidence of improper, unauthorized, unethical, and illegal activities on the part of multiple CIA employees. In each report made to the Defendants, Markson made clear, as he does now before this Court, the specifics of how the most basic precepts of the Constitution were being violated by Senior Executives of the CIA.

e.  Despite these reports, all supported by extensive documentation, defendants refused to honor their statutory obligations and their Oath of Office.  The defendants summarily declined to entertain, investigate, or adjudicate the complaints made by Markson.

f.  As noted previously in this complaint, the Director/CMDI is granted sole authority to determine what constitutes a grievance within the CIA and, once this decision is made, it is not appealable within the Agency.  Similarly, when the OIG declines to investigate a complaint, an Agency employee is left with no process for appeal.

g.  Through their various actions and inactions, as described in above paragraphs, defendants have knowingly and intentionally deprived Markson of any means of fair redress.  In the process they have, themselves, thus endorsed and abetted those Constitutional violations enumerated above and further deprived Markson of his Fifth Amendment right to due process and equal protection under the law.

C) The individual defendants, as described, have exercised the authority and power of the CIA, the agency they worked for. Through these actions, over a course of two years, Defendants have willfully violated Markson's procedural and substantive due process rights, and Plaintiff accordingly begs the court for consideration of the above Constitutional violations in accordance with the Bivens doctrine. *Bivens v. Six Unknown Named Agents*, 403 U.S. 388, 397 (1971).

D) As a direct result of these constitutional violations, Markson has suffered extensive damages, to wit:  Markson's coveted foreign assignment position was cancelled, he was deprived of the opportunity to secure other coveted assignments for which he was well

qualified, his reputation in the agency was impugned, the economic value of his manuscript has been substantially destroyed, and he has suffered a resulting loss of freedom in his chosen career, mental anguish and emotional pain, and stress-related medical problems.

## THIRD CAUSE OF ACTION

## FOURTH AND FIFTH AMENDMEN VIOLATIONS BY THE PRB AND NCS

137.     Plaintiff repeats and re-alleges the statements contained in paragraphs 1 through 130 above, inclusive.

138.     The Fifth Amendment of the U.S. Constitution guarantees that no citizen shall be deprived of life, liberty or property without the due process of law. U.S. CONST., AMEND V. The Fourth Amendment of the U.S. Constitution guarantees the right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures. U.S. CONST., AMEND IV.

139.     Defendants, acting under the color of authority of the CIA, violated Markson's Fourth and Fifth Amendment right to due process in multiple respects, to wit: a) they illegally seized Plaintiff Markson's personal property in the form of the draft manuscript, under the false pretense of government privilege; and b) they adopted inequitable and unpredictable criteria in the review of draft manuscripts, allowing Plaintiff no meaningful avenue of redress or challenge.

A. The Illegal Seizure of Markson's Fictional Manuscript

   a.  Defendants including, but not limited to, John Brennan, John D.B., Mark K., Paul S., Richard P., Karen P., and Donald R., have colluded to illegally seize plaintiff's

personal property in the form of a draft manuscript, under the false pretense of government privilege.

b. As the above statement of facts reflects, Markson complied with government regulations requiring that he submit his fictional manuscript for review prior to pursuing any attempts to publish said manuscript. Since that time, Defendants have intentionally prolonged the pre-publication review process from a standard of 30 days to more than 2 years.

c. Defendants have issued three conflicting and spurious findings that fail to withstand any reasonable scrutiny. Defendants have ignored evidence presented by Markson that compellingly refutes the defendant's findings. Defendants have issued opinions based usurped regulatory power, treated fiction as non-fiction, and persistently refused Markson's pleas to conform to governing regulations.

d. Defendants willfully shared his manuscript with individuals who had no right/need for access to same, which meets the definition of "publication" under current Agency policies. Through these actions the defendants demonstrably fully and effectively seized Markson's manuscript.

e. Markson's manuscript was initially and favorably reviewed by Jeffrey E., an expert in the particular field of operations discussed in the book. This review was completed over the course of a single weekend in early June 2012. Jeffrey E. subsequently advised defendants that there was no classified or inappropriate information in the manuscript, on three different occasions.

f. Despite the above, three months later the Defendants denied Markson permission to publish his manuscript. Upon his request for reconsideration, presenting

evidence that clearly refuted PRB assertions, the defendants established a new and unauthorized standard for approval, asserting an authority to treat fictional events as though they were factual and real, and once again denying him rights to his property.

g. The defendants have acknowledged they are asserting classification privilege over events and establishments that have never existed. When asked how publication of such material could harm national security, they have been unable to respond. This treatment of Markson's manuscript defies regulatory requirements, and directly contradicts existing policy clearly stating that the only legal grounds to deny permission for publication is potential harm to national security and/or the impairment of duties by Markson, the Agency, or the U.S. Government.

h. Defendants' unreasonable seizure of his manuscript continues to this day. It is clear they have no intent to fulfill their chartered duties and make a reasonable determination regarding the manuscript. The manuscript is only 175 pages in length. The two years of convoluted rationalizations and delayed actions serve as prima facie evidence that the defendants have effectively seized Markson's intellectual property.

i. While their actions blatantly contradicted CIA regulations and standards, each of the defendants engaged in the above actions under color of federal authority, knowing that the plaintiff lacked any forum of significant redress. The comments of defendant Karen P. noting, that in 5 years not a single PRB decision had been over-turned by the Agency, underscores the defendants' confidence in acting with complete indifference to established regulations, and their further confidence in

being able to maintain this seizure of Markson's intellectual property in violation of the Fourth Amendment.

B. Inequitable and Unpredictable Criteria Utilized in Manuscript Review In Violation of the Fifth Amendment

a. Defendants including, but not limited to, John D.B, Mark K., Paul S., Richard P., Karen P., and Donald R. have conspired to violate Markson's Fifth Amendment rights by adopting and applying inequitable and unpredictable criteria in the review of draft manuscripts.

b. As noted in the statement of facts, one of Markson's CIA peers, working in an identical position to Markson, published at least 5 fictional manuscripts during the 1990's. At the time, Markson's colleague was recognized by the Agency's Counterintelligence Center (CIC) for his work accomplishments and suffered no adverse consequences.

c. Several years later Markson attempted to do the exact same thing. But in Markson's case the defendants assailed his judgment for having even considered drafting such a manuscript, seized his manuscript and punished him.

d. As reflected in the above statement of facts, in the case of Markson, Defendants have exacted multiple forms of retaliation against Markson for having drafted the manuscript, and have denied him permission to publish the fictional manuscript for a period exceeding two years. Further, the defendants have clearly used a different standard than those employed when reviewing other works. They have claimed the authority, and even the obligation, to treat fiction as non-fiction with Markson, but not with the other cases. They have claimed terms were classified

in Markson's manuscript, which were concurrently approved as non-classified in

comparable cases. They have deemed other terms from Markson's manuscript to

be classified, only to turn around and release, as unclassified, documents

containing the exact same terms as evidenced by exhibits hereto attached.

e.  Specifically, as noted in the above statement of facts, one of Markson's

colleagues from the Directorate of Intelligence published the book <u>Red Cell</u>, a

fictional tale of espionage involving a penetration of the Chinese government. In

the book the brilliance of CIA analysis, exceptional operational acumen, and a

bureaucracy that eventually delivers justice is presented as the norm. This author

was allowed to publish his manuscript without any retaliation and, in fact, now

serves in the same component where Markson works.

f.   In Markson's draft manuscript the NCS is regularly portrayed in a less flattering

light than the above book. Managers are occasionally depicted as more concerned

with career enhancement and protecting bureaucratic turf than protecting the

country.

g.  Also concurrent with the events described in the statement of facts, a recently-

retired NCS colleague of Markson's was granted permission to publish the book

<u>Red Sparrow</u>, a fictional novel involving the recruitment of a source within the

Russian Intelligence services. As noted in the above statement of facts, words

and depictions that were deemed **classified** in Markson's manuscript were

deemed **unclassified** in his retired colleague's book.

h.  In the book <u>Red Sparrow</u> NCS officers are literally portrayed as accompanied by

colorful halos indicating sincerity and goodness, and the Russian bad guys have

steel teeth and cheap suits. Markson's manuscript, in contrast, describes a CIA bureaucratic environment overwhelmed by dysfunction and replete with internal intrigue; and the terrorist character generously risks his own life in an attempt to prevent a catastrophic attack.

    i. In the above comparable cases the authors have described the review process as taking a matter of months, whereas Markson has been denied permission to publish on three occasions stretching out over two years. The varied standards render it impossible for authors to predict what will or won't be deemed acceptable for publication.

C. The process and standards employed in review of Markson's manuscript have no basis in any rule or regulation. In fact, these practices directly contradict the governing regulations, a point that Markson has made with every appeal he has sent to the PRB. He has also highlighted that these practices were unconstitutional and deprived him of his basic civil rights.

D. Despite the above, the defendants willfully proceeded in their capricious, arbitrary, illegal, and abusive actions. Defendants, through their actions, deprived Markson of any meaningful avenue of challenge or redress. Each of the Defendants engaged in the above actions under color of federal law. The individual defendants, in their conduct described hereinabove, have exercised the authority and power of the CIA, the agency they worked for. Through their actions, Defendants have deprived Markson of have violated Markson's Fourth and Fifth Amendment rights. As a result of this deprivation of his rights, Markson has suffered, and continues to suffer, real and measurable damages of

economic, emotional, personal, and professional natures, as set out herein.

## FOURTH CAUSE OF ACTION

## VIOLATION OF THE PRIVACY ACT OF 1974

140.    Plaintiff repeats and re-alleges the statements contained in paragraphs 1 through 130 above, inclusive.

141.    The Privacy Act of 1974, 5 U.S.C. § 552a, requires that no agency shall disclose any personal record regarding an individual, to another individual, absent the prior written consent of the person to whom the record pertains. This Act specifies that such information may be shared within an agency only with those officers who have a need for the record in the performance of their duties. The Act also requires that, to the greatest extent possible, an agency shall collect information directly from the subject to whom the record pertains when the record information may result in adverse determinations about an individual's rights, benefits, and privileges under federal programs.

142.    Defendant Central Intelligence Agency has willfully and repeatedly violated section 552a of 5 U.S.C. in two respects: a) defendants inappropriately disseminated the draft manuscript; and b) defendants failed and refused to collect accurate data.

A. Unlawful Dissemination of Markson's Draft Manuscript

    a. The CIA maintains a system of records as defined in the above Act. This system involves records maintained by the Publication Review Board (PRB) and associated with individual employees and information said employees may wish to publish, including information that sometimes is of a particularly private, sensitive, or personal nature.

b. Markson provided his draft manuscript to the PRB for appropriate government review within the framework of the above system. It was understood at the time that this record would be shared only with those who had a legitimate need to know about the manuscript. More specifically, the manuscript would be shared only with those having a demonstrable authority in determining whether publication might reasonably be expected to harm national security or impair the execution of official government functions.

c. The record was shared, in an authorized fashion, with Markson's immediate supervisor, an expert in the matters discussed in the manuscript, who was in the best position to authoritatively comment on whether the manuscript contained any classified or sensitive information.

d. The attached Exhibits indicate that defendants including Mark K., Paul S., Larry N., Colin S., John R.B., Carl G., Mark P., and others whose names have been redacted from attached exhibits, had access to Markson's manuscript despite the fact that they had no valid need to know of the above record.

e. Upon statements from PRB officers, none of the above individuals were sent authorized copies of the manuscript. Yet each has confirmed knowledge of Markson's manuscript and some have even made decisions holding grave consequences for Markson based on their unauthorized knowledge of the manuscript.

f. For instance, Defendant Paul S. has indicated he leaned about Markson's manuscript on an informal basis through unidentified sources. Defendant Mark K., who fired Markson from a coveted onward assignment, has stated he learned

about the manuscript from defendant Larry N., who himself was not authorized access to the manuscript. Defendant Mark P. has stated he informally learned about Markson's manuscript through an unidentified former supervisor of Markson.

g.  All the above Defendants were well aware of the "need to know" principle, a basic security tenet of their work. Defendants manage operations involving some of the most sensitive information held by the CIA, and indeed anywhere in the U.S. government, and are thus even more deeply aware of the need for proper handling of sensitive information.

h.  Through improper distribution, and failure to prevent such distribution, the defendants have knowingly and repeatedly violated 5 U.S.C. §552a.

B.  Failure and Refusal to Collect Accurate Data

a.  The CIA maintains a system of records as defined in the above Act. This system involves records maintained by the Publication Review Board (PRB) and associated with individual employees and information said employees have provided to the PRB, including information that sometimes is of a particularly private, sensitive, or personal nature.

b.  When Plaintiff provided his draft manuscript to the PRB for appropriate government review within the framework of the above system, he made well known on multiple occasions his ready willingness to answer any questions in regard to the suitability and/or any potential security issues associated with the manuscript.

c.  As noted above, on 29 June 2012 defendants Mark K. and Paul S. summoned Markson to CIA headquarters to advise him that he had been fired from a coveted onward foreign assignment. As noted previously in this complaint, defendants took this action based solely on the fact that plaintiff had drafted a fictional manuscript.

d.  During the 29 June 2012 meeting defendants indicated a substantial lack of knowledge regarding the content of the manuscript, indicating they were relying on information obtained through informal and unauthorized channels. Incredibly, the defendants failed to take this opportunity to ask plaintiff a single question about the manuscript, to include any potential inclusion of classified or sensitive information contained therein, any correlation to factual events, his intent in drafting the manuscript, and/or any plans regarding potential publication of the manuscript.

e.  Subsequent to the above, defendants ruled Markson ineligible for multiple other positions predicated on the same ill-informed basis of knowledge. At no time did any of the defendants ask Markson a single question about the manuscript and/or its potential inclusion of classified information, his plans regarding publishing, nor the potential threat it might pose to national security.

f.  Over the course of two years defendants Richard P., Karen P., and Donald R. have denied Markson permission to publish his manuscript predicated on unfounded assertions that his manuscript was autobiographical in nature and correlated to real events.

    g.  These same assertions were used to improperly justify their decision to treat the manuscript as non-fiction.

    h.  In the process they twice asked Markson's immediate supervisor whether the events in the manuscript correlated to any real operations or activities. On both occasions said supervisor responded in the negative.

    i.  Not once however, during the two year review process, did any member of the PRB, or any other employee of the CIA, ask Markson a single question about the events in the manuscript, whether said events correlated with any real or factual events/operations, or his intent in drafting the manuscript to begin with.

    j.  Through their ongoing, willful, and malicious refusal to collect or seek accurate information directly from Markson, and instead relying on ill-informed and unauthorized opinions of third parties, the defendants have repeatedly violated 5 U.S.C. §552a.

C. Each of the Defendants engaged in the above actions under color of federal law. The individual defendants, in their conduct described hereinabove, have exercised the authority and power of the CIA, the agency they worked for. As a direct result of their actions and violations, Markson has been subjected to multiple adverse determinations that resulted in lost rights, benefits, and privileges. Not least among these losses was the immediate termination of his coveted onward assignment and exclusion from an entire class of sensitive positions within the NCS. As a direct result of the defendant's negligence in collecting accurate information regarding Markson's manuscript, Markson has suffered, and continues to suffer significant economic, emotional, personal, and professional damages.

## FIFTH CAUSE OF ACTION

## CIVIL CONSPIRACY

143.     Plaintiff repeats and re-alleges the statements contained in paragraphs 1 through 130 above, inclusive.

144.     The defendants, Central Intelligence Agency,, John D. B, Mark K., Paul S., Elizabeth K., Carl G., John R. B., Larry N., Colin S., Mark P., Carmen M., David Buckley, Valerie C., Richard P., Karen P., Donald R., and John(s) Doe, have conspired to deprive plaintiff Markson of his liberty, property, wellbeing, and most basic constitutional rights.

145.     As the statement of facts reflects, and the attached exhibits demonstrate, there has been, and continues to be, continued contact and coordination among the defendants with the consistent objective being to deny Markson permission to publish his manuscript, and to further exact retaliation for his attempted exercise of Constitutional rights.

146.     As part of this conspiracy the defendants have coordinated in taking multiple adverse personnel actions, from cancelling Markson's onward assignment, to disqualifying him from an entire class of positions, and then specifically and illegally disregarding his application for specific assignments.

147.     The defendants have spread false and derogatory information impugning plaintiff's reputation and character, and propagated this information throughout the NCS through an informal secondary personnel system known as a "hall file".

148.     The defendants have avoided documentation of their actions in an effort to prevent Markson from redress and, when Markson filed reports of improper, unauthorized, and illegal behavior, they have refused to perform clearly stated duties of investigation.

149.     Without any authority to review Markson's manuscript, and after his announced immediate retirement, defendant Larry N. corresponded with defendant Mark K. and provided information regarding the manuscript, declaring that the drafting of the manuscript reflected poor judgment and implying that Markson was not fit for his onward assignment.

150.     Defendant Larry N. subsequently shared the manuscript with defendant Colin S. and then forwarded unwarranted speculation to Mark K. that Markson had likely employed the services of an editor, without Agency approval, prior to submitting the manuscript to the PRB.

151.     Months after defendant Mark K. had fired Markson from his onward assignment with CIC, and further precluded any potential that Markson would serve in any future CIC assignment, he continued to request/receive updates regarding actions of the PRB in regards to Markson's manuscript, clearly expressing satisfaction that the book had not been approved for publication.

152.     Defendant John R.B. spread rumors to Jeffery E. falsely indicating that Markson had been involved in an "incident" on the 7th floor of HQS and was subsequently escorted from the building by security personnel.

153.     Defendant Carl G. has maintained that Markson was not qualified" for a position whose duties he had executed for seven years in exemplary fashion and with consistently superior performance evaluations.

152.     Defendant Karen P. repeatedly described Markson's manuscript as "autobiographical" despite have been advised to the contrary by Markson's immediate supervisor.

153.     Without statutory or regulatory authority, The PRB asserted the power and privilege to treat fictional events the same real life.  They failed to maintain control over the

64

distribution of the manuscript to the point where even defendant Colin S. has acknowledged that the related developments were well known throughout the NCS.

154.    Despite Markson's provision of clear and compelling evidence that multiple Agency regulations and federal laws had been violated, defendants Carmen M., Valerie C., and David Buckley abdicated their official duties and refused to conduct investigations of the abusive activities conducted by multiple CIA Executives.

155.    In and through the execution of the above activities, through their various actions and inactions, the defendants have communicated with intent to deprive Markson of personal property in the form of a fictional manuscript, and the significant economic opportunity associated with same.  Each of the Defendants engaged in the above actions under color of federal law.  The individual defendants, in their conduct described hereinabove, have exercised the authority and power of the CIA, the agency they worked for.  They have significantly damaged his professional reputation and career prospects, and violated his most basic civil rights.  As a result of defendants' actions Markson has suffered, and continues to suffer, significant economic, emotional, personal, and professional damages.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff Jim Markson requests that the Court award him the following relief:

A) Declare and find that Defendants violated the First, Fourth, and Fifth Amendments to the United States Constitution and associated laws, and award compensatory damages in an amount that is fair, just and reasonable;

B) Award compensatory damages caused by the CIA's failure to timely process Markson's manuscript and permit publication, keeping in mind the substantial economic blow the manuscript suffered by not capitalizing on the timing following the Boston Marathon bombings when interest in terrorist activity was at a peak;

C) Order that the CIA strike from its files all derogatory evaluations and comments regarding Markson, which date from and after the date Markson submitted his manuscript, and requiring that henceforth the Agency neither directly nor indirectly rely on, give any weight to, or mention such adverse material in any decisions regarding Markson, or in any communications within the Agency or to persons outside the Agency, regarding Markson.

D) Injunctive relief from further retaliation for filing this complaint or submitting any materials to the PRB, including negatively influencing security clearance reviews and job applications;

E) Refer those CIA officials responsible for violating the Privacy Act for prosecution under 5 U.S.C. §552a;

F) Award declaratory name –clearing relief;

G) Award exemplary and punitive damages;

H) Award reasonable attorney's fees and costs under the Equal Access to Justice Act or any

other applicable law, and;

I) all other appropriate relief as may be just and proper.

DATE:   June 27 2014

Respectfully submitted,

JIM MARKSON
BY COUNSEL

Phoenix Ayotte Harris
Counsel for Jim Markson
VA Bar ID: 76009
Law Offices of Phoenix Ayotte Harris, PLLC
114 North Alfred Street
Alexandria, VA 22314
(703) 684-7908
(703) 684-9700 (fax)
Phoenix@pholaw.com